*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 32**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JUDD NIXON,
*Appellant,*

*v.*

EDWARD CLAY,
*Appellee.*

No. 20170532
Filed July 11, 2019

On Direct Appeal

Fourth District, Utah County
The Honorable Derek P. Pullan
No. 150401989

Attorneys:

Leonard E. McGee, Peter R. Mifflin, Sandy, for appellant

Sadé A. Turner, Karmen C. Schmid, Scarlet R. Smith, Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1   At the outset of the oral argument in our court in this case, counsel for the appellee presented a quote from the late Senator John McCain. The quote alludes to the sport of mixed martial arts as a "dangerous and brutal exercise," while then warning of a "sport, more vicious and cold-blooded, that takes place in Mormon meetinghouses across this great nation of ours"—"LDS Church Basketball." This quote, sadly, appears to be a matter of internet apocrypha. We can find it attributed to a McCain floor speech on various pages of the world-wide web, but no such quote appears in the pages of the Congressional Record. Yet the apocryphal quote conveys an accepted view of "church ball" among many who have

experienced this phenomenon—an athletic competition acclaimed on some local t-shirts as "the brawl that begins with prayer."

¶2   At least one of the parties to this case seems to see it that way. Judd Nixon is the plaintiff in a tort suit that arose out of a basketball game at a meetinghouse of the Church of Jesus Christ of Latter-day Saints. Nixon sought to recover damages from the player he viewed as responsible for his injuries—Edward Clay. The issue on appeal is whether the district court erred in adopting a "contact sports exception" in the law of torts. The district court held that "in bodily contact games . . . participants are liable for injuries in [a] tort action only if [their] conduct is such that it is either willful or with a reckless disregard for the safety of the other player." Applying this "contact sports exception" to the facts of this case, the district court determined that Nixon's injury arose out of conduct that was not willful or reckless but was inherent in the game of basketball. On that basis the district court held that Clay owed no duty to Nixon. And it granted summary judgment to Clay.

¶3   We affirm but on a slightly modified basis. We endorse the idea of an exception to liability arising out of sports injuries. But we do not think the exception should turn on the defendant's state of mind, or be limited just to *contact* sports. We instead hold that participants in *any* sport are not liable for injuries caused by their conduct if their conduct was inherent in the sport. Applying this exception to the facts of this case, we conclude that Clay's conduct was inherent in the game of basketball. And we affirm the district court's grant of summary judgment on this basis.

I

¶4   Judd Nixon and Edward Clay were playing on opposite teams in a church-sponsored recreational basketball game. Nixon dribbled the ball down the court to take a shot. Clay pursued Nixon to try to contest the shot. As Clay approached Nixon's right side he extended his right arm over Nixon's shoulder to reach for the ball. Nixon came to a "jump stop" at the foul line and began his shooting motion. When Nixon came to this sudden stop, Clay's arm made contact with Nixon's right shoulder. Nixon then felt his left knee pop. Both men fell to the ground.[1] The referee determined that the

---

[1] Nixon gave varied explanations of how he ended up on the ground. At one point he claimed that Clay "tackled" him. Elsewhere

(continued . . .)

contact was not intentional and warranted only a common foul. Nixon unfortunately sustained a serious knee injury in the collision.

¶5 Three years later Nixon filed a complaint alleging that Clay's negligence caused his knee injury. Clay filed a motion for summary judgment two years into the litigation. Clay asked the district court to adopt a "contact sports exception" recognized in many jurisdictions. And he argued in the alternative that no jury could find that he acted negligently based on the undisputed facts.

¶6 The district court granted Clay's motion for summary judgment on both grounds. It adopted a "contact sports exception" that provides that participants in bodily contact sports are liable for injuries only when the injuries are the result of conduct that demonstrates a "willful" or "reckless disregard for the safety of the other player." Applying this test, the court first determined that basketball is a contact sport. Then it determined that Nixon's injury was not the result of "willful" or "reckless" conduct, but conduct inherent and foreseeable in the game of basketball. And it held that the contact sports exception thus shielded Clay from liability.

¶7 The court also applied the test articulated in *B.R. ex rel. Jeffs v. West*, 2012 UT 11, 275 P.3d 228. And it held, in the alternative, that no reasonable jury could find that Clay acted negligently.

¶8 Nixon now appeals, asking us to reverse the district court's ruling. He first contests the adoption of a contact sports exception. Second, he contends that the district court misapplied the summary judgment standard when it concluded that Clay's alleged "tackle" was common and foreseeable and that Clay accordingly owed Nixon no duty under *Jeffs*.

II

¶9 We affirm the district court's grant of summary judgment.[2] But we do so on a somewhat modified basis. The "contact sports exception" endorsed by the district court (and followed in a majority

---

he stated that it was possible that Clay wrapped his arms around him to try to stop him from falling. And at one point he admitted that Clay's intentions were not necessarily to take him to the ground or to cause him injury.

[2] We review the district court's legal conclusions—and in this case the adoption of a new legal rule—for correctness. *See Massey v. Griffiths*, 2007 UT 10, ¶ 8, 152 P.3d 312.

of jurisdictions) provides that a "participant in a contact sport owes a duty [to a co-participant] only if his or her conduct is willful or done with reckless disregard for the safety of another player." To apply this exception, a court must pursue a two-step inquiry. First, the court asks whether the sport at issue is a *contact* sport. If so, the court must then consider whether the alleged tortfeasor's conduct was "willful or done with reckless disregard for the safety of another player." If the alleged tortfeasor did not act willfully or recklessly he "owes no duty under a standard of ordinary negligence."

¶10 We affirm the establishment of an exception to tort liability for injuries arising out of sports. But we do not fully embrace the majority rule. We instead establish a simpler framework that avoids the complicated line-drawing problems associated with the assessment of a tortfeasor's state of mind and with the decision on whether a sport qualifies as a contact sport. We instead hold that participants in sports generally have no duty to avoid conduct that is inherent in the sport. And we clarify that the tortfeasor's state of mind may be relevant, but is not a necessary element of the exception.

¶11 Though we reject the specific exception adopted by the district court, we nonetheless affirm its grant of summary judgment. It is undisputed that Nixon was injured when Clay "reached in" and "swiped at the basketball," incidentally making contact with Nixon's shoulder. And the undisputed evidence (including photos of the foul) shows that these actions are inherent in the game of basketball. Applying the exception we adopt today to the undisputed facts, we hold that Clay had no duty to avoid the contact that allegedly caused Nixon's injury. And we affirm on that basis.

¶12 In the paragraphs below we first describe the basis for our conclusion that voluntary participants in sports owe no duty to avoid contact that is inherent in the activity. We explain our decision to depart from the majority rule and offer some commentary aimed at aiding our courts in the application of our holding. Second, we apply our standard to the undisputed facts of this case. We affirm the grant of summary judgment on the ground that it is undisputed that Nixon's injury arose out of conduct inherent in the game of basketball.

A

¶13 Our cases have established a framework for the establishment of a duty of care in the law of torts. We have announced a "general rule" that "we all have a duty to exercise care

when engaging in affirmative conduct that creates a risk of physical harm to others." *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 21, 275 P.3d 228. And we have also explained that "[t]here are exceptions to the rule . . . in categories of cases implicating unique policy concerns that justify eliminating the duty of care for a class of defendants." *Id.* In deciding whether to endorse an exception, we have looked to certain "'minus' factors" that may weigh against the imposition of a duty of care. *Id.* Those factors include "the foreseeability or likelihood of injury," "public policy as to which party can best bear the loss occasioned by the injury," and "other general policy considerations." *Id.* (citations omitted) (internal quotation marks omitted).

¶14 Nixon asks us to uphold a duty of care of a participant in a basketball game under this framework. Where such a participant undertakes an affirmative act, Nixon says that the risk of injury is foreseeable and the actor is in the best position to avoid an ensuing injury. Clay challenges these arguments on their own terms. Yet he also seeks a categorical exception that avoids the duty analysis under the foreseeability and loss-avoidance factors identified in *Jeffs*—a "contact sports" exception recognized in other jurisdictions.

¶15 We do not endorse the precise terms and conditions of this exception as framed in a majority of other jurisdictions. But we do conclude that voluntary participants in sports owe no duty to avoid contact that is inherent in the activity they are engaged in. This conclusion fits fairly within the framework established in *Jeffs*, which leaves room for "general policy considerations" as a basis for an exception to the general rule that we all owe a duty to exercise care in engaging in affirmative conduct. *Id.* As explained below, our holding is also consistent with the doctrine of primary assumption of risk, which establishes that a defendant has no duty to avoid dangers that are "inherent" in a given activity.[3]

---

[3] *See Rutherford v. Talisker*, 2019 UT 27, ¶¶ 45–46, --- P.3d --- (describing the doctrine of primary assumption of risk; explaining that it forecloses a duty in tort for conduct inherent in a voluntary activity); 57B AM. JUR. 2d *Negligence* § 763 ("An essential element of primary assumption of risk is that the plaintiff consciously and voluntarily agreed that the defendant would not have a duty to protect against a particular danger inherent in their dealing . . . ."); Kent Feuerhelm et al., *From* Wright *to* Sunday *and Beyond: Is the Law Keeping Up With the Skiers?*, 1985 UTAH L. REV. 885, 886 ("Primary
(continued . . .)

¶16 We explain the basis of our holding in the paragraphs below. We first outline the principles and policies endorsed in other jurisdictions. Then we set forth the standard that we establish.

1

¶17 The Restatement (Second) of Torts states that a decision to "[t]ak[e] part in a game manifests a willingness to submit to such bodily contacts or restrictions of liberty as are permitted by its rules or usages." RESTATEMENT (SECOND) OF TORTS § 50 cmt. b (1965). With this in mind, "[t]he majority of jurisdictions which have considered this issue have concluded that personal injury cases arising out of an athletic event must be predicated on reckless disregard of safety." *Gauvin v. Clark*, 537 N.E.2d 94, 97 (Mass. 1989).[4]

¶18 The majority rule establishes that a participant in a sport "breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability — only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." *Knight v. Jewett*, 834 P.2d 696, 711 (Cal. 1992).[5] The courts that endorse this rule have identified

---

assumption of risk bars a plaintiff from recovering for injuries caused by dangers inherent in the activity.").

[4] *See also Hackbart v. Cincinnati Bengals, Inc.*, 601 F.2d 516, 524 (10th Cir. 1979); *Nabozny v. Barnhill*, 334 N.E.2d 258, 261 (Ill. App. Ct. 1975); *Ross v. Clouser*, 637 S.W.2d 11, 14 (Mo. 1982) (en banc); *Kabella v. Bouschelle*, 672 P.2d 290, 294 (N.M. Ct. App. 1983); RESTATEMENT (SECOND) OF TORTS § 500 cmts. e & g (1965).

[5] *See also Gauvin v. Clark*, 537 N.E.2d 94, 96–97 (Mass. 1989) (plaintiff hockey player was injured when hit with hockey stick by opposing player; court held defendant's liability should be determined by whether he acted with "reckless disregard of safety"); *Ross*, 637 S.W.2d at 13–14 ("[A] cause of action for personal injuries incurred during athletic competition must be predicated on recklessness, not mere negligence."); *Kabella*, 672 P.2d at 294 (plaintiff injured in informal tackle football game; court held that "a cause of action for personal injuries between participants incurred during athletic competition must be predicated upon recklessness or intentional conduct, 'not mere negligence'" (citation omitted)); *Marchetti v. Kalish*, 559 N.E.2d 699, 703–04 (Ohio 1990) ("Thus, we join the weight of authority set forth above and require that before a

(continued . . .)

a series of policy rationales in support of this rule. We find these policy rationales quite persuasive.

¶19 Voluntary participants in sports "manifest[] a willingness to submit to . . . bodily contacts . . . permitted by its rules." RESTATEMENT (SECOND) OF TORTS § 50 cmt. b. They also submit to some bodily contact not permitted by the rules because "rule[] infractions and mishaps are virtually inevitable" in sports where bodily contact is inherent. *Leonard ex rel. Meyers v. Behrens*, 601 N.W.2d 76, 81 (Iowa 1999). Contact, both permitted by the rules and sometimes contrary to the rules, is a known and accepted risk of many sports. And "it is inapposite to the competitiveness of contact sports to impose a duty on participants to protect coparticipants from . . . known and accepted risks." *Ludman v. Davenport Assumption High Sch.*, 895 N.W.2d 902, 911 (Iowa 2017) (emphasis removed) (citation omitted).

¶20 If participants faced liability every time contact with another player resulted in an injury, a "flood of litigation" would ensue. *See Crawn v. Campo*, 643 A.2d 600, 604 (N.J. 1994) (asserting that one reason to adopt a contact sports exception is to "avoid a flood of litigation"). "[V]igorous participation in athletic activities" would be deterred. *Id.* Athletic competition "as we know it would not be played." *Pfister v. Shusta*, 657 N.E.2d 1013, 1018 (Ill. 1995) (citation omitted). And our society would be worse off as a result.

2

¶21 For these reasons we think it appropriate to establish an exception to tort liability for certain injuries arising out of voluntary participation in sports. But we do not deem it appropriate to require proof that a defendant's conduct was reckless or intentional. Nor do we think it is necessary to limit the exception to an arbitrary subcategory of "contact" sports. Instead we hold that voluntary participants in a sport cannot be held liable for injuries arising out of any contact that is "inherent" in the sport. Under our rule, participants in voluntary sports activities retain "a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." *Knight*, 834 P.2d at 708. But there is no duty to lower or eliminate risks that are inherent in an activity.

---

party may proceed with a cause of action involving injury resulting from a recreational or sports activity, reckless or intentional conduct must exist.").

¶22 We depart from the majority rule in part because we find the "intentional or reckless" conduct standard unnecessary and potentially problematic as applied to some sports. Under the majority rule, sport "participant[s] [are] liable for injuries . . . if the participant's conduct was 'either deliberate, willful or with a reckless disregard for safety of the other player.'" *Pfister*, 657 N.E.2d at 1015 (citation omitted). In applying this standard most jurisdictions endorse the Restatement definition of recklessness:

> [An] actor's conduct is in reckless disregard of the safety of another if he does an act . . . knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

RESTATEMENT (SECOND) OF TORTS § 500. This standard seems problematic in at least some sports. In sports like football, rugby, ice hockey, and other high-contact sports, contact between players is often simultaneously intentional or reckless *and* inherent in the game. Even contact technically prohibited by the rules, like a personal foul in the game of basketball, is rather routinely initiated intentionally as an element of game strategy. *See Pfister*, 657 N.E.2d at 1018 ("[In] [b]asketball, hockey, and soccer . . . players regularly commit contact beyond that which is permitted by the rules even as applied." (citation omitted)). And some conduct in high-contact sports will at least sometimes be the kind of conduct that is in "reckless disregard of the safety of another"—at least in the sense that there is a known, high risk of physical harm to another player.

¶23 In high-contact sports—where intentional conduct is expected and even encouraged—the majority rule could impose liability on players for simply playing the game as it is designed and expected to be played. Injuries arising out of such contact are of course unfortunate. But they do not warrant tort liability.

¶24 Some jurisdictions couch their recklessness exception in terms that incorporate an inherency inquiry—creating liability only when a player "intentionally injures another player or engages in conduct that is so reckless as to be totally *outside the range of the ordinary activity* involved in the sport." *Knight*, 834 P.2d at 711 (emphasis added). This seems to create a two-part inquiry where both the defendant's mental state and the inherency of the contact

must be determined in order to apply the exception. But the first step seems unnecessary.

¶25 If a defendant's actions are inherent in a sport, the defendant should not face liability. And if the defendant causes injury through conduct not inherent in the sport, he or she should face liability under ordinary tort principles. A participant's state of mind may be relevant to the inherency inquiry; but a showing of intentional or reckless conduct is not necessary. If a participant in a sport initiated contact for the sole purpose of injuring a co-participant, for example, and not for a purpose that is strategic to or inherent in the game, that may suggest that the contact was not inherent. And merely negligent acts, on the other hand, may more often be seen as inherent. But again the key question is whether any given contact is inherent in the sport. The defendant's state of mind is at most a factor of circumstantial relevance.

¶26 The inherency inquiry is an outgrowth of our longstanding doctrine of primary assumption of risk.[6] This doctrine is rooted in a principle of implied consent—that participants implicitly consent to dangers that are inherent in the activity they voluntarily participate

---

[6] This doctrine is to be distinguished from what our cases refer to as secondary assumption of risk. Secondary assumption of risk is an affirmative defense that applies when a person "unreasonab[ly] encounter[s] . . . a known and appreciated risk." *Moore v. Burton Lumber & Hardware Co.*, 631 P.2d 865, 870 (Utah 1981); *see also Rutherford*, 2019 UT 27, ¶ 47 (discussing secondary assumption of risk). This doctrine was abrogated by the Utah Comparative Negligence Act, 1973 Utah Laws 710–12. *See Jacobsen Constr. Co. v. Structo-Lite Eng'g, Inc.*, 619 P.2d 306, 309 (Utah 1980). Primary assumption of risk is different. It involves a policy determination (based on implied consent) that there is no basis for the imposition of a duty in tort. *See Rutherford*, 2019 UT 27, ¶ 46. And this doctrine is alive and well in our law. *See Fordham v. Oldroyd*, 2007 UT 74, ¶ 13, 171 P.3d 411 ("[W]e do not violate principles of comparative negligence when we evaluate the presence or absence of duty under what had previously been denominated as primary assumption of the risk."); *Hale v. Beckstead*, 2005 UT 24, ¶ 24, 116 P.3d 263 ("Where there is no duty, there is no fault to compare or distribute under the comparative fault scheme.").

in.[7] For such dangers, the doctrine of primary assumption of risk provides that there is no duty, and thus no liability, in tort.

¶27 The inherency inquiry will depend on the facts of a particular case and the characteristics of a particular sport. We adopt no uniform standard that will easily resolve all cases. But we outline below a few guiding principles to aid in the application of this exception.

¶28 Contact that is permitted and anticipated by the rules of a sport is clearly inherent.[8] But inherency should not be based solely on what is permitted or prohibited by the rules of the game.

> [Many sports] permit some bodily contact and, in actual practice, more contact is permitted than a reading of the rules would indicate. . . . [P]layers

---

[7] *See Rutherford*, 2019 UT 27, ¶¶ 45–46 (explaining that "primary express assumption of risk" is rooted in contract, while noting that "primary implied assumption of risk" extends to risks inherent in an activity voluntarily entered into); 57B AM. JUR. 2D *Negligence* § 763 ("An essential element of primary assumption of risk is that the plaintiff consciously and voluntarily agreed that the defendant would not have a duty to protect against a particular danger inherent in their dealing . . . ."); Kent Feuerhelm et al., *From* Wright *to* Sunday *and Beyond: Is the Law Keeping Up With the Skiers?*, 1985 UTAH L. REV. 885, 886 ("Primary assumption of risk bars a plaintiff from recovering for injuries caused by dangers inherent in the activity."); *see also Morgan v. State*, 685 N.E.2d 202, 207 (N.Y. 1997) ("[B]y engaging in a sport . . . a participant consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally . . . ."); *Turcotte v. Fell*, 502 N.E.2d 964, 968 (N.Y. 1986) ("As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation." (citation omitted)).

[8] A few of the many possible examples of this type of rule-permitted contact include: boxing out in basketball, tackling the ball-carrier in football, punching an opponent in the face in a boxing match, or hitting another player with the ball in a dodgeball game. This contact would fall squarely within inherent contact foreseen and permitted by the rules.

> regularly commit contact beyond that which is permitted by the rules even as applied. In basketball, such an illegal contact is described as a foul for which a sanction is imposed. Sometimes the player fouled is injured. This is to be expected.

*Pfister*, 657 N.E.2d at 1018 (citation omitted). Because conduct outside the scope of the rules is often expected, we warn against inherency inquiries that are focused only on the technical rules of the game.

¶29 When determining whether contact, prohibited or not by the rules, is an inherent risk of the sport, courts should consider factors like the frequency at which this type of contact occurs, the circumstances in which it occurred, whether the contact is an aspect of the regular strategy of the game, and the severity of the sanction imposed by game officials.[9] These inquiries, and others that may be

---

[9] This inquiry may leave some difficult cases at the margins. But there will also be easy cases at opposite ends of the spectrum. A common personal foul involving a routine basketball move (like an attempt at the ball that results in a hack across the arm), for example, is easily classified as inherent in the game of basketball, as it is frequent, results only in a minor sanction, and is obviously strategic. *See* NBA OFFICIAL, *Rule No. 12: Fouls and Penalties*, https://official.nba.com/rule-no-12-fouls-and-penalties/ (last visited July 10, 2019) (explaining that many routine personal fouls may result in a free throw or the ball being taken out of bounds and inbounded by the other team). An example of non-inherent contact in basketball, by contrast, might involve a bench-clearing brawl in which punches are thrown at an opponent. This is unfortunately not unheard of. But it is infrequent, not a matter of the regular strategy of basketball, and results in severe sanctions (ejection and even suspension and fines). NBA OFFICIAL, *Rule No. 12: Fouls and Penalties*, *Section VI – Fighting Fouls* https://official.nba.com/rule-no-12-fouls-and-penalties/#fightingfouls (last visited July 10, 2019) (explaining that players are immediately ejected and fines and suspensions can be levied against players who fight during a game); *3 NBA stars suspended after Lakers-Rockets fight, alleged spitting*, CBS NEWS (Oct. 22, 2018, 6:36 AM), https://www.cbsnews.com/news/lakers-rockets-brawl-nba-suspends-brandon-ingram-rajon-rondo-chris-paul/ (discussing the suspension of three NBA players after a fight during a basketball game).

(continued . . .)

added as our caselaw unfolds, may be aided by expert testimony and other evidence—such as photographs, video, and eyewitness testimony.[10]

¶30 Courts should use this evidence to help resolve the dispositive question—whether the contact that caused the injury was either an essential or inherent part of participation in a sport voluntarily engaged in by the parties. And that inquiry should be rooted in the implied consent basis for the doctrine of primary assumption of risk. The ultimate question, in other words, is whether the contact that caused the injury was sufficiently frequent and strategic that a person engaging in the activity could be said to have impliedly consented to the contact.

¶31 We depart from the majority rule in one additional way. The exception we create is not a "contact sports exception" with application only to those sports that courts deem "contact sports." The "contact sport" inquiry has led to some rather arbitrary line-drawing, typically hinging on how much contact is anticipated

---

This latter example also highlights the danger in attributing too much significance to the "strategic" nature of an act. A player could conceivably find some strategic value in throwing a punch at a star player from the other team—in an attempt to prompt a fight or otherwise take him out of the game. But that sort of move is not part of the regular strategy of basketball. And it would not be inherent in basketball because it is (thankfully) sufficiently infrequent that no reasonable basketball player would be seen as impliedly consenting to this kind of contact.

[10] This inquiry grows even more difficult when the "sport" at issue is an unorganized pickup game or a non-traditional sport. *See, e.g.*, *Pfister*, 657 N.E.2d 1013 (applying contact sports exception to a pickup game of kick the can). But the relevant inquiry should not be whether "the sport was formally organized or coached." *Id.* at 1017. Recreational or competitive, formal or informal, the relevant inquiry remains whether the contact at issue was an inherent part of the game the participants voluntarily engaged in. When faced with non-traditional sports or pick-up games courts should do their best to discern what is inherent in the activity voluntarily engaged in by the participants, relying on the same evidence and considerations as in an organized or traditional sport.

by the sport as a whole.[11] Such line-drawing seems unnecessary. Even "non-contact sports"—sports that anticipate only incidental or infrequent contact between co-participants—should be subject to the protections of the exception outlined above.

¶32 An example may be helpful. The game of tennis does not involve frequent bodily contact among participants in the sport. For that reason this sport conceivably might not qualify as a "contact sport." But there are obvious risks of injurious contact in tennis. Players may anticipate getting hit with a tennis ball or colliding with a teammate during a doubles match. And tennis players in these situations should be exposed to no more liability for injuries caused by their contact than a basketball player who collided with another player during a game. The amount and degree of contact inherent in a sport is not the key inquiry; the key question is whether the contact that did occur is inherent in the sport.

¶33 For the reasons stated above, we endorse a simpler sports exception that focuses solely on the inherency of the conduct causing the injury. We believe that this approach alleviates the confusion and unnecessary inquiries required by the majority rule.

B

¶34 Though we decline to endorse the exact "contact sports exception" adopted by the district court, we nonetheless affirm its grant of summary judgment. On appeal, we review the decision to grant summary judgment for correctness. *Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56. "An appellate court . . . make[s] its own decision on the correctness of summary judgment, reviewing the same paper record that was before the trial court to decide whether there are genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law." *Id.* ¶ 17. A grant of summary judgment is proper when "there is no genuine dispute as

---

[11] *See, e.g.*, *Pfister*, 657 N.E.2d at 1017–18 (determining whether or not a unorganized game of kick the can qualified as a contact sport); *Feld v. Borkowski*, 790 N.W.2d 72, 79 (Iowa 2010) (reasoning that softball was a contact sport by looking at the contact anticipated by the sport as a whole); *Noffke ex rel. Swenson v. Bakke*, 760 N.W.2d 156, 161–63 (Wis. 2009) (discussing whether or not the legislatively created "contact sports exception" applied to cheerleading by determining whether cheerleading as a whole could be considered a contact sport).

to any material fact and the moving party is entitled to judgment as a matter of law." UTAH R. CIV. P. 56(a). In reviewing the evidence before the court on summary judgment, the "facts and all reasonable inferences drawn therefrom [are viewed] in the light most favorable to the nonmoving party." *Massey v. Griffiths*, 2007 UT 10, ¶ 8, 152 P.3d 312 (alteration in original) (citation omitted) (internal quotation marks omitted).

¶35 We affirm the entry of summary judgment under the above standard. The undisputed facts demonstrate that Nixon's injury was caused by contact inherent in the game of basketball. And the sport exception that we establish forecloses the imposition of liability when an alleged tortfeasor's conduct is inherent in the sport.

¶36 Nixon concedes that he was injured when Clay initially made contact with his right shoulder.[12] The testimony and photographs presented on appeal indicate that this initial contact occurred when Clay attempted to "reach in" and "swipe at the basketball" to prevent Nixon from making a shot. And it is undisputed that reaching in for the ball and swiping at the ball are common basketball moves.[13] It is likewise undisputed that fouls, both accidental and intentional, are a part of the game of

---

[12] Nixon was asked: "[C]an you tell me when it is that you believe that your knee was injured in this incident?" He responded, "I remember feeling my knee pop as I was contacted." The attorney then clarified, "[B]efore you were on the ground; is that correct?" To which Nixon responded, "Correct." In a later question on the same topic, Nixon was asked, "When he put his right arm around your right shoulder and when he made that contact, you felt your left knee pop?" Nixon said, "Yes." The attorney then again clarified, "[I]t is your belief that the injury happened before you were even on the ground?" To which Nixon again answered, "Yes."

[13] The head of the recreational basketball league in which Nixon and Clay played testified that "[b]asketball is a contact sport" and that "[f]ouls happen." He explained that "when someone is driving with the ball, it's very common for the opposing player to take a swipe at the ball and miss and hit their arms or sometimes their body." Rick Camp, the referee of the game at issue, testified that "a player going for the ball, but missing and hitting the body of the player in control of the ball [is] . . . a common foul." Nixon does not contest these statements.

basketball—so much so that each player is permitted five fouls per game. In this case, spectators at the game and the referee testified that Clay's contact was properly classified as a common foul.

¶37 Nixon does not contest the proposition that "reaching in" and "swiping at the ball" are inherent in the game of basketball. And he points to no disputed facts on this question. Instead he just asserts that Clay did more than just reach in and swipe at the ball. He alleges that Clay "tackled" him. And "tackling," Nixon argues, is not inherent in the game of basketball. This is insufficient, however, because Nixon's allegation of tackling is immaterial. Nixon concedes, after all, that his injury happened during Clay's swipe and not as a result of the alleged "tackle." And because the parties agree that the injury did not occur during the "tackle," we need not decide whether some form of "tackling" is inherent in the game of basketball.

¶38 To survive summary judgment, Nixon would have to demonstrate that there is a dispute as to whether the contact giving rise to the injury was inherent in the sport. And we have no such dispute here. Clay did not owe Nixon a duty to avoid "reaching in" and "swiping at the ball" because such conduct is inherent in the game of basketball. And absent such a duty, there can be no liability. *See Rocky Mountain Thrift Stores, Inc. v. Salt Lake City Corp.*, 887 P.2d 848, 852 (Utah 1994) ("Without a duty, there can be no negligence as a matter of law, and summary judgment is appropriate."). We affirm the decision granting summary judgment to Clay on this basis.

III

¶39 We reject the "contact sports exception" endorsed by the district court and established in a majority of other courts—an exception that turns on a defendant's state of mind and on whether an activity qualifies as a "contact sport." We instead decide that voluntary participants in sports have no duty of care to avoid contact that is inherent in the activity. Applying this exception to the undisputed facts, we conclude that Clay's conduct—"reaching in" and "swiping at the basketball"—was inherent in the game of basketball. And we affirm the district court's grant of summary judgment on this basis.

———————