*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 30**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

DAVID SCOTT IPSEN,
*Appellant,*

*v.*

DIAMOND TREE EXPERTS, INC.,
*Appellee.*

No. 20181052
Heard December 11, 2019
Filed May 20, 2020

On Direct Appeal

Third District, Salt Lake
The Honorable Andrew H. Stone
No. 160904449

Attorneys:

James L. Ahlstrom, Steven R. Glauser, Salt Lake City, for appellant

Barbara K. Berrett, Zachary C. Myers, Salt Lake City, for appellee

JUSTICE HIMONAS authored the opinion of the Court, in which CHIEF JUSTICE DURRANT and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE filed a dissenting opinion, in which JUSTICE PEARCE joined.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶1    A core principle of tort law is that we each owe "a duty to exercise reasonable care" if our "conduct presents a risk of harm to others." *Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986, 993 (2019) (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 7 (AM. LAW. INST. 2005)). To be sure, there are a multitude of exceptions to this principle, the professional rescuer rule that we adopted in *Fordham v. Oldroyd*, 2007 UT 74, 171 P.3d

411, being but one. That rule provides that "a person does not owe a duty of care to a professional rescuer for injury that was sustained by the very *negligence* that occasioned the rescuer's presence and that was within the scope of hazards inherent in the rescuer's duties." *Id.* ¶ 13 (emphasis added).

¶2 Today, we hold that the professional rescuer rule extends no further than *Fordham*'s definite and careful formulation and that a person *does* owe a duty of care to a professional rescuer for injury that was sustained by the *gross negligence* or *intentional tort* that caused the rescuer's presence. Accordingly, we partially reverse and remand this case to the district court to allow it to adjudicate Ipsen's gross negligence claims.[1]

## BACKGROUND[2]

¶3 A mulch fire occurred on the property of appellee, Diamond Tree Experts, Inc. In the week before the mulch fire, there had been at least two other fires on the property. And ten days before the mulch fire, a representative from the Salt Lake County Health Department told Diamond Tree that the mulch on its property was piled too high and that Diamond Tree needed to reduce it. Diamond Tree did not comply, meaning that at the time of the fire, it was in knowing violation of several ordinances—including the fire code—and of industry standards regarding the safe storage of mulch.

¶4 David Scott Ipsen was one of the firefighters who responded to the mulch fire. While working by the fire engine, and away from the fire, a thick cloud of smoke and embers engulfed him, leaving him unable to breathe. Ipsen sustained severe and permanent injuries—injuries that prevented him from returning to his job as a firefighter.

¶5 Ipsen sued Diamond Tree in district court for gross negligence, intentional harm, and negligent infliction of emotional distress. Diamond Tree moved for summary judgment, claiming that it owed no duty to Ipsen under Utah's professional rescuer rule, which says that "a person does not owe a duty of care to a

---

[1] We do not opine on the sufficiency of the allegations that Ipsen brings against Diamond Tree. That is for the district court to evaluate on remand.

[2] On appeal from an order for summary judgment, we view "the facts and all reasonable inferences . . . in the light most favorable to the nonmoving party." *Espenschied Transp. Corp. v. Fleetwood Servs.*, 2018 UT 32, ¶ 3 n.1, 422 P.3d 829 (citation omitted) (internal quotation marks omitted).

professional rescuer for injury that was sustained by the very negligence that occasioned the rescuer's presence and that was within the scope of hazards inherent in the rescuer's duties." *Fordham v. Oldroyd*, 2007 UT 74, ¶ 13, 171 P.3d 411. The district court agreed with Diamond Tree and dismissed Ipsen's claim for three main reasons. First, it held that under *Fordham*, Diamond Tree owed Ipsen no duty of care, even if Diamond Tree's underlying conduct was egregious carelessness or violated ordinances. Second, the district court found that all the injuries that Ipsen alleged were inherent in firefighting. Third, the district court held that although *Fordham* does not immunize intentional behavior from liability, Ipsen had not established a genuine dispute of fact about an intentional behavior on Diamond Tree's part.

¶6   Ipsen appealed. We exercise jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶7   "We review a grant of summary judgment for correctness. We give no deference to the district court's legal conclusions and consider whether the court correctly decided that no genuine issue of material fact existed." *Heslop v. Bear River Mut. Ins. Co.*, 2017 UT 5, ¶ 15, 390 P.3d 314 (citations omitted) (internal quotation marks omitted).

## ANALYSIS

¶8   In *Fordham v. Oldroyd*, we announced the professional rescuer rule. Under that rule, "a person does not owe a duty of care to a professional rescuer for injury that was sustained by the very negligence that occasioned the rescuer's presence and that was within the scope of hazards inherent in the rescuer's duties." 2007 UT 74, ¶ 13, 171 P.3d 411. Ipsen asks us to limit this rule so that professional rescuers can recover in tort for injuries stemming from gross negligence, intentional torts, and the violation of statutes and ordinances. Based on public policy, we hold that the *Fordham*'s professional rescuer rule does not apply in cases of gross negligence and intentional torts.[3] A person thus *does* owe a duty of

---

[3] The dissent posits that the issue of duty in cases of intentional tortious misconduct is not "presented." *Infra* ¶ 29 n.17. But the district court ruled on it, and one of the parties briefed the issue. *Supra* ¶ 5. We see no reason to ignore it. Moreover, as we find that gross negligence does not fall within *Fordham*'s professional rescuer rule, it is mere common sense that the more severe case of intentional torts does not fall within it either. "But Moses said to

(continued . . .)

care to a professional rescuer for injuries sustained by gross negligence or an intentional tort causing the rescuer's presence. Our holding is based on the vast difference in culpability and the considerably greater deterrence considerations gross negligence and intentional torts present compared to ordinary negligence.

¶9 "[C]ommon law is an aggregation of judicial expressions of public policy." *Id.* ¶ 4. One area of the common law that is especially appropriate for "judicial public policy judgments" is the law of torts, and specifically the assignment of legal duty.[4] *Id.*; *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 17, 143 P.3d 283 ("Legal duty . . . is the product of policy judgments applied to relationships."). The existence of a legal duty reflects this court's conclusion, "on the basis of the mores of the community," William L. Prosser, *Palsgraf Revisited*, 52 MICH. L. REV. 1, 15 (1953), that "the sum total" of the policy considerations say that "the plaintiff is [or is not] entitled to protection," *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo. 1987) (second alteration in original) (citation omitted).

¶10 The general rule, as we outline at the beginning of this opinion, is that "we all have a duty to exercise care when engaging in affirmative conduct that creates a risk of physical harm to others." *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 21, 275 P.3d 228. We carve out exceptions to the existence of duty only in "categories of cases implicating unique policy concerns that justify" doing so. *Id.* In considering whether to make an exception, we rely on factors such as the foreseeability or likelihood of injury, public policy as to which party can best bear the loss occasioned by the injury, and

---

the Lord, 'If the Israelites will not listen to me, why would Pharaoh listen to me . . . ?'" *Exodus* 6:12. We see no reason to leave litigants in limbo about such a natural logical conclusion.

[4] We are not the "exclusive arbiters of public policy." *Fordham*, 2007 UT 74, ¶ 5. Our public policy pronouncements yield to those of the Utah Legislature. But, "[w]hen policy considerations bear on a subject lodged firmly within the court's sphere, like the common law, it is entirely appropriate for the court to make the policy judgments necessary to get the law right." *Yazd v. Woodside Homes Corp.,* 2006 UT 47, ¶ 20, 143 P.3d 283. We have done so in numerous tort law cases. *See*, *e.g.*, *Nixon v. Clay*, 2019 UT 32, ¶ 21, 449 P.3d 11; *Fordham*, 2007 UT 74, ¶ 6; *Yazd*, 2006 UT 47, ¶ 26. And we do so again today.

other general policy considerations. *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 19, 215 P.3d 152.[5]

¶11 In *Fordham*, we determined, based on public policy,[6] that "a person does not owe a duty of care to a professional rescuer for injury that was sustained by the very negligence that occasioned the rescuer's presence and that was within the scope of hazards

---

[5] The parties have not briefed us on the foreseeability or likelihood of injury of professional rescuers due to gross negligence or intentional acts. That said, as we express below, we think that general policy considerations are determinative here.

[6] The dissent argues that in *Fordham*, this court "rooted" the "professional rescuer rule" in "the doctrine of primary assumption of risk." *Infra* ¶ 32. But the *Fordham* court relied on policy considerations only. *Fordham*, 2007 UT 74, ¶¶ 7, 16; *see also id.* ¶ 25 (Wilkins, A.C.J., concurring and dissenting) ("[A] third rationale became necessary to support the adoption of a professional rescuer rule. That rationale, relied on by my colleagues and the court of appeals in this case, is public policy."). The court's discussion of "assumption of the risk" was only meant to explain "why we have less to fear from an accusation that a professional rescuer rule is little more than assumption of the risk in disguise." *Id.* ¶ 10. And although the dissent can attempt to re-write *Fordham*'s reasoning to include the assumption of risk doctrine, *infra* ¶ 32 n.18, it is clearly evident that the *Fordham* court discussed the doctrine for the limited reason of rebuffing concerns about the professional rescuer's doctrine in other jurisdictions. *Fordham*, 2007 UT 74, ¶¶ 12–13. Indeed, in *Rutherford v. Talisker Canyons Finance, Co., LLC*, 2019 UT 27, 445 P.3d 474, our recent exploration of the assumption of risk doctrine, which canvased our state's case law about it, the *Fordham* opinion is nowhere to be found.

The dissent also contends that although the question in *Fordham* was one of policy, "the policy inquiry under our case law is centered on the question of implied consent." *Infra* ¶ 46. But the *Fordham* majority opinion does not even include the phrase "implied consent," nor any discussion of this concept. Instead, this court focused on the need to assure the public's ability to use professional rescuers' services "without fear of exposing their assets to compensate their rescuer in the event of injury," *Fordham*, 2007 UT 74, ¶ 7, and on the proposition that "the consequences of one's inattention do not include the compensation of those on whom all of us collectively confer the duty to extricate us from our distress." *Id.* ¶ 8. We therefore reject the dissent's attempt to imply otherwise.

inherent in the rescuer's duties." 2007 UT 74, ¶ 13. We explained that the public policy underlying this exception is that "firefighters and police officers have a relationship with the public that calls on them to confront certain hazards as part of their professional responsibilities." *Id.* ¶ 7. And "[i]t would be naive to believe that fire and police professionals will be called on to draw on their training in meeting only those hazards brought on by prudent acts gone awry." *Id.*

¶12 The question we must answer today is whether the policy that supports a duty carve-out[7] for professional rescuers' suits for injuries stemming from negligence also supports a carve-out for their claims for injuries arising from gross negligence and intentional torts.[8]

¶13 The two public policy concerns that drove us to apply the professional rescuer rule to negligence in *Fordham* are culpability and deterrence.[9] And because these two concerns do not apply

---

[7] The dissent argues that in this opinion we "establish[] an exception to *Fordham*." *Infra* ¶ 43. That argument misses the mark. *Fordham* is the exception to the general rule that we all have a duty to exercise reasonable care. All we do today is clearly delineate *Fordham*'s boundaries.

[8] *Fordham*'s formulation of the professional rescuer rule only referenced negligence. 2007 UT 74, ¶ 13. The district court here found our statement in *Fordham* to be a broad determination of lack of duty towards professional rescuers, "[r]egardless of whether [a person's] conduct was negligent, reckless, [or] indifferent." It was not.

[9] We recently decided in *Nixon* that a person's state of mind does not affect the imposition of a duty in the context of the contact-sports exception. Specifically, we held that "voluntary participants in sports owe no duty to avoid contact that is inherent in the activity they are engaged in." 2019 UT 32, ¶ 15. We found that the imposition of duty should not hinge on a participant's mental state, because such a standard is "unnecessary and potentially problematic as applied to some sports." *Id.* ¶ 22. We explained that in some sports, "intentional conduct is expected and even encouraged," and that creating a duty of care for reckless or intentional conduct, "could impose liability on players for simply playing the game as it is designed and expected to be played." *Id.* ¶ 23.

(continued . . .)

when it comes to gross negligence and intentional torts, they compel the opposite result here.

¶14 First, sound public policy advised us in *Fordham* that the "consequences of one's *inattention*" do not create a duty to compensate "those on whom all of us collectively confer the duty to extricate us from our distress." *Id.* ¶ 8 (emphasis added). But gross negligence and intentional torts implicate far more than mere inattention; they involve severe levels of culpability. Gross negligence is "the failure to observe even slight care; it is carelessness or recklessness to a degree that shows *utter indifference to the consequences* that may result." *Atkin Wright & Miles v. Mountain States Telephone & Telegraph Co.*, 709 P.2d 330, 335 (Utah 1985) (emphasis added) (internal quotation marks omitted) (quoting *Robinson Ins. & Real Estate, Inc. v. Sw. Bell Tel. Co.*, 366 F. Supp. 307, 311 (W.D. Ark. 1973)); *see also Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶ 35, 423 P.3d 1150. And intentional

---

Perhaps our language in *Nixon* was too slackly cabined. That is lamentable because the dissent now attempts to strip this language from its context and make it sweep more broadly. *Infra* ¶¶ 35, 40-41. But *Nixon*'s conclusion is irrelevant to the professional rescuers' rule for two reasons. First, in sports, a rule attributing liability based on a participant's state of mind might impose it even if a participant played "by the rules." But in the professional rescuers' context, any grossly negligent or intentional behavior is not a part of the accepted behavior in a well-ordered society. Although the dissent resists this obvious difference, *infra* ¶ 49, *Fordham*'s exception was expressly limited to situations resulting from one's inattention. 2007 UT 74, ¶ 8. The dissent argues that this limit is only "the net effect of our holding," *infra* ¶ 49, but misses that this court expressly held this "broadly shared value about the workings of a well-ordered society" is the rationale from which *Fordham* emanates. *Fordham*, 2007 UT 74, ¶ 8.

Second, sports are governed by a separate set of rules than societal activities that may require the presence of professional rescuers. Tort duty in sports is governed by courts, as the dissent mentions, but there are other mechanisms to adjudicate one's tortious behavior during a sporting event. The rules of most—if not all—sports impose penalties on individuals and teams. But there are no such rules that protect professional rescuers from one's gross negligence or intentional tort. Courts, then, are the only institutions with authority to do so. And in exercising that authority to decide whether to impose a duty toward professional rescuers, it is proper for courts to evaluate the relevance and weight of one's state of mind.

tortious conduct goes even beyond that. *Atkin Wright & Miles*, 709 P.2d at 335; *see also Wagner v. State*, 2005 UT 54, ¶ 32, 122 P.3d 599 (explaining that "[t]he intent with which tort liability is concerned . . . is an intent to bring about a result which will invade the interests of another in a way that the law forbids.") (citation omitted) (first alteration in original). So, although gross negligence differs only in degree from ordinary negligence, *Negligence*, BLACK'S LAW DICTIONARY 1134 (11th ed. 2019), that difference in degree is large and matters. "[T]he workings of [our] well-ordered society" include a "widely held belief that one is not exposed to tort liability for negligence requiring rescue." *Fordham*, 2007 UT 74, ¶ 8. But they do not include such belief when the degree of negligence is egregious, and even less so when the actions that requiring professional rescuers' assistance were intentional.

¶15 The second policy concern in *Fordham* was that negligent people might be reluctant to call professional rescuers if they knew they could be liable for the rescuers' resulting injuries. *Id.* But because people who act with gross negligence or intentionally are an order or two of magnitude more culpable than those who act negligently, they are unlikely to call professional rescuers in the first place. Imagine the emergency call: "911, I was utterly callous about setting (or deliberately set) my neighbor's house on fire, and I'd like to report myself." Pure fantasy. Thus, we are not seriously concerned that appreciably fewer of these individuals will call for help if we do not extend the professional rescuer rule to their situation.

¶16 For these very reasons, courts in other jurisdictions have differentiated between negligence on the one hand and gross negligence and intentional torts on the other. They have generally held that "[w]hile the fireman's rule may provide a shield of liability for defendants in cases involving ordinary negligence, it is not a license to act with impunity or without regard for the [professional rescuer's] well-being." *Lambert v. Schaefer*, 839 S.W.2d 27, 29 (Mo. Ct. App. 1992) (citation omitted) (internal quotation marks omitted). This "recognition of moral fault as a component of public policy is a common principle of tort law." *Carson v. Headrick*, 900 S.W.2d 685, 690–91 (Tenn. 1995) (holding that the rule does not extend to injuries caused by "intentional, malicious, or reckless acts of a citizen").[10]

---

[10] Courts around the country have articulated varied versions and scopes of the professional rescuer rule. However, almost all the courts that have addressed whether the professional rescuer rule

(continued . . .)

¶17 According to the dissent, there is a "very real difficulty" in distinguishing negligence from gross negligence. The dissent uses colorful language to explain that the difference is one of degree only—the existence of which is left to the fact finder to decide. *Infra* ¶¶ 44–45. The distinction we clarify today, the dissent warns us, "will swallow the rule we adopted in *Fordham*," *infra* ¶ 45, presumably allowing for professional rescuers to flood the courts with claims, by merely adding "a vituperative epithet" to their filing. *Infra* ¶ 45.

¶18 This slippery-slope argument is unpersuasive. This court has long dealt with the difference between negligence and gross negligence. *See, e.g.*, *Atkin Wright & Miles*, 709 P.2d at 335. We have explained that "[w]hile negligence generally connotes the failure to observe due care, gross negligence and recklessness are the failure to observe even slight care." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 44, 235 P.3d 730 (citation omitted) (internal quotation marks omitted). And we have repeatedly found that it is possible to determine whether one was *grossly* negligent on summary judgment. *See, e.g.*, *Penunuri*, 2017 UT 54, ¶¶ 35–40; *Blaisdell v. Dentrix Dental Sys., Inc.*, 2012 UT 37, ¶ 15, 284 P.3d 616.[11]

---

applies to gross negligence and intentional torts have concluded similarly to us today—that it does not. *See*, *e.g.*, *Gaither v. Metro. Atlanta Rapid Transit Auth.*, 510 S.E.2d 342, 345 (Ga. Ct. App. 1998) ("A firefighter's or police officer's job does not include assuming the general risk of harm from a person's wil[l]ful and wanton or malicious conduct."); *Labrie v. Pace Membership Warehouse, Inc.*, 678 A.2d 867, 869 (R.I. 1996) (limiting the application of the rule to "crisis created by a defendant's ordinary negligence"); *see also*, *e.g.*, *BPS, Inc. v. Parker*, 47 S.W.3d 858, 862 (Ark. 2001); *Thomas v. Pang*, 811 P.2d 821, 825 (Haw. 1991); *Fox v. Hawkins*, 594 N.E.2d 493, 498 (Ind. Ct. App. 1992); *State Farm Mut. Auto. Ins. Co. v. Hill*, 775 A.2d 476, 484–87 (Md. Ct. Spec. App. 2001); *Torchik v. Boyce*, 905 N.E.2d 179, 181–82 (Ohio 2009); *Thomas v. CNC Invs., L.L.P.*, 234 S.W.3d 111, 120–21 (Tex. App. 2007); *Goodwin v. Hare*, 436 S.E.2d 605, 606 (Va. 1993); This policy preference is also exhibited by legislatures in several states that have codified the professional rescuer rule but have not extended its effect to gross negligence and intentional torts. *See*, *e.g.*, MICH. COMP. LAWS § 600.2967; N.H. REV. STAT. § 507:8-h.

[11] The dissent points to one case to substantiate its argument that our general rule is that "the grossness of a party's negligence will be a matter left to the eye of the fact-finder." *Infra* ¶ 45. But that

(continued . . .)

¶19 The dissent maintains that we should not treat negligence and gross negligence differently just because of their difference in degree. *Infra* ¶ 45. But in another context—that of liability waivers—this court has found that the difference between ordinary and gross negligence does matter.[12] On public policy grounds, we have disallowed liability waivers for grossly negligent acts while permitting those that release liability stemming from negligent acts.[13] *See, e.g., Hawkins v. Peart*, 2001 UT 94, ¶ 9, 37 P.3d 1062, *superseded by statute on other grounds as stated in Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, 301 P.3d 984 (noting that a liability release "is always invalid if it applies to harm wilfully inflicted or caused by gross or wanton negligence" (citation omitted)).

¶20 We are not the only court to make this distinction. *See, e.g., City of Santa Barbara v. Superior Court*, 161 P.3d 1095, 1097 (Cal. 2007)

_____

case, *Norman v. Utah Hotel Co.*, stands for that proposition only in that *particular* instance and certainly establishes no general rule. 206 P. 556, 560 (Utah 1922) ("As we view it, in order to hold that the evidence in this case is insufficient to establish gross negligence, as a matter of law, we would be compelled to depart from the uniform holdings of this court that, *under the circumstances here disclosed*, the question is one of fact for the jury and not one of law for the court." (emphasis added)).

[12] Moreover, *Norman*—the case that the dissent uses to argue that gross negligence is a matter for the fact finder—presents an ancient yet pertinent example of this difference, which the dissent so vividly resists. *Norman* addressed the case of a gratuitous bailment that requires a party "to exercise slight care only" which meant they would be "liable only for what, in law, is termed to be gross negligence." *Id.* at 559. In other words, we recognized that a gratuitous bailer would not be liable for any ordinary negligence but would be liable for gross negligence.

[13] The dissent concedes our point but claims the difference in context make our analogy irrelevant. *Infra* ¶ 45 n.22. But analogies only require "similar[ity] in some ways." *Analogy*, BLACK'S LAW DICTIONARY (11th ed. 2019). Requiring identical circumstances obviates our ability to use analogies. Our use of liability waivers is in response to the dissent's unsupported argument that our distinction between ordinary and gross negligence "will swallow the rule we adopted in *Fordham*." *See infra* ¶ 45. We pointed out that this court and many others have adopted this distinction in other contexts, where such horrific predictions have not materialized. The dissent prefers to not respond to this point, which we can only assume means that it concedes its validity.

("[A]n agreement made in the context of sports or recreational programs or services, purporting to release liability for future gross negligence, generally is unenforceable as a matter of public policy."); *Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994) ("[A] party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross."); *Rafferty v. Merck & Co., Inc.*, 92 N.E.3d 1205, 1218–19 (Mass. 2018) ("[W]hile a party may contract against liability for harm caused by its negligence, it may not do so with respect to its gross negligence or, for that matter, its reckless or intentional conduct" and "[i]mplicit in both our common and statutory law, then, is a long-standing public policy that, although we may be willing in certain circumstances to excuse ordinary negligence, we will not tolerate the reckless disregard of the safety of others." (citation omitted) (internal quotation marks omitted)); *Shelby Mut. Ins. Co. v. City of Grand Rapids*, 148 N.W.2d 260, 262 (Mich. Ct. App. 1967) ("[A] party may contract against liability for harm caused by his negligence in performance of a contractual duty, [but] he may not do so with respect to his gross negligence."); *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370 (N.Y. 1992) ("It is the public policy of this State . . . that a party may not insulate itself from damages caused by grossly negligent conduct." (citations omitted)); *Adams v. Roark*, 686 S.W.2d 73, 75 (Tenn. 1985) ("While the case law and announced public policy of Tennessee favors freedom to contract against liability for negligence, it does not favor contracting against liability for gross negligence, and such an agreement is unenforceable." (citations omitted)). And state legislatures have made the same differentiation in other contexts. *See*, *e.g.*, MASS. GEN. LAWS ch. 229, § 2 (railroads not liable for negligence for causing death of trespasser but liable for reckless conduct); MICH. COMP. LAWS § 257.606a (ordering that governmental immunity from duty for highway maintenance "does not apply to actions which constitute gross negligence.").

¶21 Much like the dissent here, litigants in California raised a slippery-slope argument in the liability waiver context. They argued that voiding liability waivers for grossly negligent behavior would "prove unworkable, or that application of such a standard would frustrate the proper termination of suits on summary judgment or foster untoward liability." *City of Santa Barbara*, 161 P.3d at 1107. The California Supreme Court rejected this argument, holding that "it does not appear that the application of a gross

11

negligence standard, as defined in California,[14] has a tendency to impair the summary judgment process or confuse juries and lead to judgments erroneously imposing liability." Quite the opposite: "[t]hese statutes reflect the sound legislative judgment that, under a gross negligence standard, meritless suits will typically be disposed of by summary judgment; that when a case goes to trial[,] the jury, instructed on this standard, will be less likely to confuse injury with fault;" and that "verdicts reflecting such confusion will be more readily reversed, whether by the trial or appellate court, than under an ordinary negligence standard." *Id.* at 1108 (citation omitted) (internal quotation marks omitted).

¶22 We agree with this reasoning. We have no reason to believe, nor are we presented with evidence from the parties, the dissent, or our sister states that, unlike with liability waivers, limiting the professional rescuer's rule to negligence will swallow the rule in litigation about the potential grossness of negligent acts.

¶23 The dissent also writes expansively about the compensation that "people who work in dangerous jobs" receive. *Infra* ¶ 34 n.19. But the parties have not briefed this point, and nothing in the record supports it. Moreover, many professional rescuers volunteer their time and efforts. *See, e.g.*, *State v. Alonzo*, 973 P.2d 975, 977 (Utah 1998) (police volunteer); *State v. Graham*, 2011 UT App 332, ¶ 20, 263 P.3d 569 (volunteer fire department); *Fox v. Brigham Young Univ.*, 2007 UT App 406, ¶ 3, 176 P.3d 446 (volunteer emergency medical technicians). We have not excluded them from the *Fordham* exception, but other jurisdictions have diverging decisions about the matter. *Compare Roberts v. Vaughn*, 587 N.W.2d 249, 252 (Mich. 1998) (holding that the professional rescuer's rule does not apply to volunteers on public policy grounds), *with Waggoner v. Troutman Oil Co., Inc.*, 894 S.W.2d 913, 916 (Ark. 1995) (holding that the rule does apply to volunteers on public policy grounds), *and Buchanan v. Prickett & Son, Inc.*, 279 N.W.2d 855, 860 (Neb. 1979) (holding that the rule does apply to volunteers under assumption-of-the-risk principles). The dissent's compensation argument does not apply to volunteer professional rescuers, but the harsh consequence of the dissent's suggested expansion of the *Fordham* professional rescuer's rule most certainly would. The dissent concedes this point, but contends "we could easily reserve any decision on [volunteer rescuers] for a case in which it arises." *Infra* ¶ 34 n.19. The dissent's move makes

---

[14] California defines gross negligence as the "failure to exercise even slight care, or an extreme departure from the ordinary standard of conduct." *City of Santa Barbara*, 161 P.3d at 1106.

*Fordham*'s rule even more complex. Moreover, where does that leave the rule in the case of a future professional rescuer who shows they did not receive any additional hazardous compensation? Yet a further complication of the rule?

¶24 Ipsen also asks us to hold that the *Fordham* professional rescuer rule does not apply when the presence of professional rescuers is required because of a violation of an ordinance or statute. We decline that invitation. We hold that violations of ordinances or statutes on their own are not enough to infer that a duty exists.[15] As we explain above, our public policy considerations are shaped in connection with the degree of carelessness that precipitated the actions requiring the presence of the professional rescuers. In violating an ordinance or statute, one's conduct might be negligent, grossly negligent, or intentional. Narrowing the professional rescuer rule in the way that Ipsen proposes would allow suits for even minor infractions and violations. This would generate litigation when there has been only ordinary negligence, which would be against the rule's rationale.

¶25 In sum, we decline to extend *Fordham*'s professional rescuer rule any further. The professional rescuer rule applies *only* when the relevant action was ordinarily negligent and "within the scope of hazards inherent in the rescuer's duties." *Fordham*, 2007 UT 74, ¶ 13. But a person *has* a duty towards professional rescuers in cases of gross negligence and intentional acts, and professional rescuers may recover against them in such circumstances.

---

[15] Ipsen also argues that his injuries, even if caused by mere negligence, do not fall within the *Fordham* exception as they are not inherent in firefighting. The district court treated the inherency inquiry as a question of law and determined that Ipsen's injury—smoke inhalation—is inherent in firefighting. Ipsen argues that this is a question of fact, which should be determined on case-by-case examination. This argument fails because "duty is a question of law determined on a categorical basis." *West*, 2012 UT 11, ¶ 25. More specifically, we "analyze each pertinent factor in the duty analysis at a broad, categorical level for a class of defendants without focusing on the particular circumstances of a given case." *Mower v. Baird*, 2018 UT 29, ¶ 16, 422 P.3d 837 (citation omitted) (internal quotation marks omitted). The inherency of the injury is a factor in the duty analysis under *Fordham* and is a question of law. We find no reason to treat it differently than any other duty factor and reject the notion that it should be adjudged factually and case-by-case. We thus reject Ipsen's argument on this point and affirm the district court's ruling that Ipsen's injury was inherent in firefighting.

¶26 Because the district court held that *Fordham*'s exception to duty extends to gross negligence, it did not determine whether Ipsen's claims about Diamond Tree's conduct amount to gross negligence. We reverse the district court's decision in this regard and remand the case to the district court to rule whether Diamond Tree's actions were grossly negligent, creating a duty to Ipsen.[16]

**CONCLUSION**

¶27 We clarify that the professional rescuer rule we adopted in *Fordham* is tethered to its own language. We hold that a person owes professional rescuers a duty of care when that person's gross negligence or intentional tort triggers the rescuers' presence. We thus partially reverse the summary judgment order and remand the case to the district court for adjudication in accordance with this opinion.

––––––––––––

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶28 Diamond Tree is charged with "gross negligence" in committing fire code and other violations that led to the spontaneous combustion of merchandise (mulch) piled on its business property. David Scott Ipsen was a firefighter called to put out the fire. He suffered injuries from smoke inhalation and ultimately retired when he was unable to continue his work. He then filed suit against Diamond Tree in tort, asserting that its acts of "gross negligence" were the cause of his injuries. The district court dismissed this claim, concluding that Diamond Tree owed no duty to Ipsen under the "professional rescuer rule" adopted in *Fordham v. Oldroyd*, 2007 UT 74, 171 P.3d 411.

¶29 I would affirm. I find the question presented to be controlled by our analysis in *Fordham* and reinforced by our more recent decision in *Nixon v. Clay*, 2019 UT 32, 449 P.3d 11. These cases establish that the duty inquiry here is based on the doctrine of primary assumption of risk as informed by the principle of implied consent. As applied here, these doctrines tell us that there is no duty in a case like this one because smoke inhalation from fighting

––––––––––––

[16] The district court did rule that *Fordham*'s exception does not cover intentional torts but held that Ipsen did not show that Diamond Tree's actions were intentional. Ipsen did not challenge these findings in his briefing, only impliedly in oral argument. Given the district court's application of the correct legal rule, we affirm the district court order in that regard.

fires—whether set negligently or by a higher level of negligence we might call "gross"[17]—is "inherent" in the voluntary acts of a firefighter.

¶30 I respectfully dissent on the grounds that (1) the rationale and standards in *Fordham* and *Nixon* foreclose the imposition of a duty; and (2) the majority's attempts to distinguish these cases are unpersuasive.

I

¶31 In *Fordham v. Oldroyd*, we established the "professional rescuer rule" in Utah, holding that "a person does not owe a duty of care to a professional rescuer for injury that was sustained by the very negligence that occasioned the rescuer's presence and that was within the scope of hazards inherent in the rescuer's duties." 2007 UT 74, ¶ 13, 171 P.3d 411. We rendered that ruling in recognition of the fact that the injury at issue in that case "was within the scope of those risks inherent in the professional rescuer's duties." *Id.* ¶ 6. Noting that "firefighters and police officers have a relationship with the public that calls on them to confront certain hazards as part of their professional responsibilities," we held that there was no duty in tort that arises in the exercise of those duties. *Id.* ¶ 7. We found it "naive to believe that fire and police professionals will be called on to draw on their training in meeting only those hazards

---

[17] The majority announces a rule establishing a duty that arises in cases of "gross negligence" or "intentional torts." But the latter question (of a duty in cases of intentional misconduct) is not presented by the facts of this case, and I see no reason to reach it here.

The majority reaches this question on the grounds that "the district court ruled on it, and one of the parties briefed the issue." *Supra* ¶ 8 n.3. But the majority itself affirms the district court's determination that Ipsen did not show that any of Diamond Tree's actions were intentional. *See supra* ¶ 26 n.16. It also concedes that "Ipsen did not challenge these findings in his briefing." *Supra* ¶ 26 n.16. So there is no intentional tort at issue in this case, and thus no reason to decide whether intentional torts fall within *Fordham*'s professional rescuer rule.

The majority responds by asserting that the decision to recognize a gross negligence exception to *Fordham* must logically lead to an exception for intentional torts. *Supra* ¶ 8 n.3. This "common sense" proposition, *supra* ¶ 8 n.3, may hold for some forms of gross negligence and intentional torts, but not others. I would thus reserve this question for a case in which it is squarely presented.

brought on by prudent acts gone awry." *Id.* And we accordingly held that professional rescuers are owed no tort duty by those they are duty-bound—and compensated—to protect.

¶32 We rooted this holding in the doctrine of primary assumption of risk.[18] *Id.* ¶¶ 13–15. Because the officer plaintiff in *Fordham* was in the course of a "seemingly usual activity for a highway patrol trooper at an accident scene" when he was injured (by an automobile accident caused by a negligent driver), we held that the professional rescuer rule established an exception to the general rule imposing a duty of reasonable care. *Id.* ¶ 15. And we emphasized that "[t]he nature of the rescuer-rescued relationship is one that contemplates allocation of costs across society generally for injuries sustained by professional rescuers." *Id.* ¶ 17.

¶33  The *Fordham* rule was admittedly announced in the context of an allegation of mere negligence. But the terms of and rationale for our holding sweep more broadly—in a manner that covers the gross negligence alleged in this case. A firefighter's "relationship with the public" anticipates that he will be asked to fight fires set by a wide range of acts of carelessness. And there is no room for a conclusion that a fire like the one at issue here—set by careless disregard of the fire code and other regulations in a business that surely desired not to have its merchandise go up in smoke—is somehow outside the "scope of those risks inherent in" firefighting.

---

[18] The majority insists that "the *Fordham* court relied on policy considerations only," asserting that the discussion of assumption of risk in that case "was only meant to explain why 'we have less to fear from an accusation that a professional rescuer rule is little more than assumption of the risk in disguise.'" *Supra* ¶ 11 n.6 (quoting *Fordham v. Oldroyd*, 2007 UT 74, ¶ 10, 171 P.3d 411). But this wasn't all we said about assumption of risk in *Fordham*. We also explained that primary assumption of risk is "an alternative expression for the proposition" that "there was no duty owed or there was no breach of an existing duty." *Fordham*, 2007 UT 74, ¶ 12 (internal quotation marks and citation omitted). And we went on to hold that the defendant in that case "owed no duty" because "imposing one would offend sound public policy." *Id.* ¶ 14. The public policy analysis in *Fordham*, in other words, is inextricably intertwined with the assumption of risk analysis. Invocation of the one hardly forecloses reliance on the other. And both lines of analysis appear in *Fordham*, the majority's insistence notwithstanding.

The fighting of such fires is surely a "seemingly usual activity" for a firefighter.[19]

¶34 The line between "mere negligence" and "gross negligence" is a thin one. And a firefighter who arrives on the scene of a fire is not stopping to ask about the level of egregiousness of the negligence that caused the fire. It is therefore "naive to believe" that firefighters "will be called on to draw on their training in meeting only those hazards brought on by" mere negligence. *See id.* ¶ 7.

¶35 This conclusion is reinforced by our decision in *Nixon v. Clay*, 2019 UT 32, 449 P.3d 11. In *Nixon* we applied the doctrine of

---

[19] People who work in dangerous jobs like firefighting are compensated by the market for these risks. Their salaries are higher than those with otherwise comparable, but less dangerous jobs. This is what economists call "hazard pay." *See* W. Kip Viscusi, *Job Safety*, *in* THE CONCISE ENCYCLOPEDIA OF ECONOMICS 490, 490–91 (David R. Henderson, ed., 2nd ed. 2007) (describing the "extra pay for job hazards" as "establish[ing] the price employers must pay for an unsafe workplace" and explaining that "[t]hese wage premiums are the amount workers insist on being paid for taking risks"); James C. Robinson, *Hazard Pay in Unsafe Jobs: Theory, Evidence, and Policy Implications*, 64 MILBANK Q. 650, 652 (1986) (explaining that according to "[m]ainstream economic theory," "competitive pressures in the labor market force firms with unsafe jobs to pay extra-high wages" because if "a negative job characteristic of one kind (dangerous conditions) is not balanced by a positive characteristic of another kind (high wages, good fringe benefits, etc.) the job will not be filled"). Hazard pay is thus rooted in the theory of "compensating differentials" which traces its origin to Adam Smith. *Id.* at 652; *see also Rueda v. Utah Labor Comm'n*, 2017 UT 58, ¶ 180 n.7, 423 P.3d 1175 (Lee, A.C.J., separate opinion) (explaining how "an employee called upon to work with lead paint on a daily basis is likely receiving higher compensation in the form of hazard pay because of the known risks associated with that employment" as opposed to "an office worker" who "is likely compensated in accordance with the low risks associated with office employment").

Volunteer rescuers of course receive no such hazard pay. *See supra* ¶ 23. But the assumption of risk rationale discussed above is merely supported by, and not dependent on this point. *Contra supra* ¶ 23. Regardless, this case does not involve a volunteer rescuer, and we could easily reserve any decision on that fact pattern for a case in which it arises.

primary assumption of risk in holding that there is no duty in the context of voluntary interactions occurring as a result of the inherent risks of a sport. We said that this decision "involves a policy determination (based on implied consent) that there is no basis for the imposition of a duty in tort." *Id.* ¶ 26 n.6. And we cited *Fordham* for the proposition that "this doctrine is alive and well in our law." *Id.*

¶36 In reaching this conclusion we declined to establish a "contact sports exception" *per se*. We rejected the "majority rule," which stated that there is no duty for injuries incurred in a "contact sport" except where the tortfeasor acted "willfully or recklessly." *Id.* ¶¶ 9–10. Instead we established a "simpler framework" focused purely on the primary assumption of risk doctrine. *Id.* ¶ 10. Citing the Restatement (Second) of Torts section 50 comment b, we noted that "[c]ontact . . . is a known and accepted risk of many sports." *Id.* ¶ 19. And we held that there is no duty arising from contacts that are a result of "voluntary participation in sports." *Id.* ¶ 21.

¶37 In so concluding we held that the tortfeasor's "state of mind" is "not a necessary element" of the inquiry into the existence of a duty in tort. *Id.* ¶ 10. We held that "the 'intentional or reckless' conduct standard" was "unnecessary and potentially problematic as applied to some sports." *Id.* ¶ 22. "In sports like football, rugby, ice hockey, and other high-contact sports," we noted that "contact between players is often simultaneously intentional or reckless *and* inherent in the game." *Id.* And we therefore specified that the duty inquiry is not tied to the tortfeasor's state of mind but instead to "inherency." *Id.* ¶ 25.

¶38 "The inherency inquiry," we explained, "is an outgrowth of our longstanding doctrine of primary assumption of risk." *Id.* ¶ 26. And that doctrine, in turn, "is rooted in a principle of implied consent"—the notion "that participants implicitly consent to dangers that are inherent in the activity they voluntarily participate in." *Id.* "For such dangers," we held that "the doctrine of primary assumption of risk provides that there is no duty, and thus no liability, in tort." *Id.*

¶39 *Nixon* thus provides that "the dispositive question" is "whether the contact that caused the injury was either an essential or inherent part of participation in a sport voluntarily engaged in by the parties." *Id.* ¶ 30. "And that inquiry should be rooted in the implied consent basis for the doctrine of primary assumption of risk." *Id.* "The ultimate question," then, "is whether the contact that caused the injury" was such "that a person engaging in the activity could be said to have impliedly consented to the contact." *Id.*

¶40 The premises of our *Nixon* opinion further reinforce the application of the *Fordham* rule to cases involving allegations of gross negligence. Under *Nixon* the key inquiry is a matter of inherency under the doctrine of primary assumption of risk. And inherency is a question of implied consent. *Nixon* establishes that a tortfeasor's state of mind is not the controlling question. Acts that cause injuries can be "simultaneously . . . reckless *and* inherent in" a voluntary activity. *Id.* ¶ 22. So the "dispositive question" is "whether the contact that caused the injury was either an essential or inherent part of participation in" a voluntary activity. *Id.* ¶ 30. That forecloses Ipsen's position.

¶41 That also follows from the "implied consent" rationale in *Nixon*. Firefighters impliedly consent to the risk of smoke inhalation in the course of their jobs. Smoke inhalation is one of the central risks of firefighting.[20] It is surely inherent in the job. And the inherency doesn't disappear when the fire is caused by a heightened level of negligence.

¶42 I would resolve this case on these grounds. I find these conclusions dictated by *Fordham* and *Nixon*. And I would thus affirm the district court's decision dismissing Ipsen's tort claim.

II

¶43 The majority disagrees. It establishes an exception to *Fordham* and imposes a duty for fires set by gross negligence. It says that "[t]he two public policy concerns that drove us to apply the professional rescuer rule to negligence in *Fordham* are culpability and deterrence." *Supra* ¶ 13. And it holds that there is a duty to a firefighter in tort where a fire is set by gross negligence because such activity "involve[s] severe levels of culpability" — "far more" than mere negligence — and raises no concerns of deterring people from calling the fire department for help. *Supra* ¶¶ 14–15. I agree

---

[20] *See* P.W. Brandt-Rauf et al., *Health hazards of firefighters: exposure assessment*, 45 BRIT. J. INDUS. MED. 606, 606 (1988) (discussing various toxic chemical components of smoke from common burning materials and explaining that these "hazardous byproducts of combustion are encountered *during the normal occupational activities of firefighters*" as attested by various studies) (emphasis added); Tee L. Guidotti & Veronica M. Clough, *Occupational Health Concerns of Firefighting*, 13 ANN. REV. PUB. HEALTH 151, 151 (1992) (explaining that the "acute hazards of firefighting, *primarily* trauma, thermal injury, *and smoke inhalation*[] are obvious" (emphases added)).

with the latter point.[21] But I don't think the concern for deterrence is the driving consideration. And the line between mere negligence and gross negligence is too thin for me to agree with the court's first point.

¶44 As this court long ago recognized, "accordion words like 'mere negligence' and 'gross negligence' or 'wanton negligence' suggest comparisons only and give no absolute rule for guidance."

_____

[21] While I agree with the conclusion that imposing tort liability for gross negligence doesn't raise deterrence concerns, I disagree with the majority about why that is. The majority says that "people who act with gross negligence" are "unlikely to call professional rescuers in the first place." *Supra* ¶ 15. It bases that conclusion on the specter of a 911 call in which the caller reports that he was "utterly callous about setting" a "neighbor's house on fire" and is calling "to report [him]self." *Supra* ¶ 15. Because such a call is "[p]ure fantasy," the majority says that it is thus "not seriously concerned that appreciably fewer of these individuals will call for help" if we subject them to tort liability through imposition of a duty to professional rescuers. *Supra* ¶ 15. I agree that the call imagined by the majority is fantasy. But I don't think that means that people won't call to report fires set by those who were utterly callous.

For one thing, fires are often reported by people who have no idea how it was started—by someone other than the one who started it, for example. For another, even the person who started the fire may have no clear sense of whether his acts will ultimately be deemed to cross the thin line between ordinary and gross negligence. Like the firefighter who arrives on the scene, he "is not stopping to ask about the level of egregiousness of the negligence that caused the fire," *supra* ¶ 34, before calling 911. And even if the person who set the fire knew he was grossly negligent, he could still decide it is worth it to call the fire department to mitigate any damage to his property—despite the prospect that he might ultimately be liable for any injuries to responding firefighters. Lastly, the person who set the fire would have no reason to confess to being "utterly callous" in setting the fire. That is "[p]ure fantasy" for all sorts of reasons, not the least of which is that the degree of any culpability in setting a fire is not the point of the 911 call. *See supra* ¶ 15.

My bottom line is that I think the 911 call will often get made even for fires set by gross negligence. I thus disagree with the premise of the majority's deterrence analysis but agree that the imposition of tort liability here would not raise meaningful deterrence concerns.

*State v. Lingman*, 91 P.2d 457, 466 (Utah 1939). The tenuous nature of the distinction has been recognized by numerous courts and commentators. Prosser commented on the "vague and impracticable" nature of the distinction between "degrees of negligence." W. PAGE KEATON ET AL., PROSSER AND KEATON ON THE LAW OF TORTS § 34, at 210–11 (5th ed. 1984) [hereinafter PROSSER ON TORTS]. In his view, as in mine, "'gross' negligence is merely the same thing as ordinary negligence, 'with the addition,' as Baron Rolfe once put it, 'of a vituperative epithet.'" *Id.*; *see also Stanulonis v. Marzec*, 649 F. Supp. 1536, 1543 (D. Conn. 1986) (describing the distinction between mere negligence, gross negligence, and recklessness as "the difference between 'a fool, a damned fool, and a God-damned fool'") (quoting W. PROSSER ET AL., TORTS 207 (6th ed. 1976)).

¶45 The "very real difficulty of drawing satisfactory lines of demarcation" thus "justifies the rejection of the distinctions in most situations." PROSSER ON TORTS § 34, at 211. For these reasons the grossness of a party's negligence will be a matter left to the eye of the factfinder. *See Norman v. Utah Hotel Co.*, 206 P. 556, 560 (Utah 1922) ("[T]he question [of gross negligence] is one of fact for the jury and not one of law for the court."). That problem opens up the real possibility that the exception we establish today will swallow the rule we adopted in *Fordham*. Most allegations of negligence can be recast as gross negligence. All it takes is the addition of "a vituperative epithet." For that reason I do not agree that the mere difference in degree between the two forms of negligence "matters" here.[22] *Supra* ¶ 14. I see little difference as a matter of culpability.

---

[22] I do not dispute that our law has recognized this distinction in other areas—such as where we have disallowed liability waivers for gross negligence while permitting them for ordinary negligence. *Supra* ¶ 19. But the fact that we have recognized this distinction elsewhere hardly requires us to do so here. Admittedly, the general concept of assumption of risk is implicated in both contexts. But the question implicated by the liability waiver context is different from the one presented in the professional rescuer setting. In the first context we are deciding whether and when private parties are allowed to contract out of underlying duties in tort. In the second we are determining, in the first instance, what the scope *of those underlying tort duties* should be. The line-drawing problem arises in both contexts. But the fact that we have tried to draw the line in the first context tell us nothing about whether we should endorse it in the second.

¶46 Culpability, moreover, is not the controlling consideration in our case law. *Fordham* and *Nixon* root the duty inquiry in the doctrine of primary assumption of risk. The question of whether to endorse a duty in tort is surely a question of "policy," as the majority states. *Supra* ¶ 9. But the policy inquiry under our case law is centered on the question of implied consent. And for reasons explained above we should conclude that smoke inhalation from fighting fires is an inherent part of the job—and one that Ipsen impliedly consented to in entering into this profession.

¶47 The tortfeasor's state of mind is not controlling under *Nixon*. The majority concedes the general point but opines that the "conclusion is irrelevant to the professional rescuers' rule for two reasons." *Supra* ¶ 13 n.9. First the court tries to distinguish sports and firefighting in terms of what is "part of the accepted behavior" of these activities. *Supra* ¶ 13 n.9. It says that sports may involve reckless or even intentional contact that is within the expected course of the game, but "in the professional rescuers' context, any grossly negligent . . . behavior is not a part of the accepted behavior in a well-ordered society." *Supra* ¶ 13 n.9. Then the court seeks to draw a distinction based on who governs these activities. It asserts that "sports are governed by a separate set of rules than societal activities that may require the presence of professional rescuers," and concludes that, by contrast, courts are "the only institutions with authority" to "protect professional rescuers from [] gross negligence," and therefore can properly "evaluate the relevance and weight of one's state of mind" to the duty imposed. *Supra* ¶ 13 n.9.

¶48 I see no basis for these distinctions. They are circular. And the court's holding is an effective override of our case law.

¶49 The scope of "accepted behavior" in the activities covered by our tort law is precisely the question presented for our decision. We have held that that question turns on whether the conduct giving rise to injury is "inherent" in a voluntary activity. So we can hold that gross negligence that causes smoke inhalation is "not a part of the accepted behavior" tolerated by our tort law in this setting. And we can claim to distinguish that from sports, where reckless and even intentional contact is "accepted." But that is just the net effect of our holding today. It is not a basis for a decision.[23]

---

[23] The majority seeks to refute the assertion that its analysis on this point is circular, pointing to the *Fordham* court's reliance on "broadly shared value[s] about the workings of a well-ordered

(continued . . .)

¶50 The second point is similarly problematic. There is no distinction in who "governs" the two activities for purposes of our decision in this case. Sports are not "governed" by a separate institution when it comes to duty in tort law. They are governed by the courts. And this court decided on the scope of "accepted behavior" in sports in *Nixon*—in holding that there was no duty in tort arising out of activity that is inherent in voluntary sports. So again there is no distinction to be made. "Courts . . . are the only institutions with authority to" govern the "societal activities that may require the presence of professional rescuers." *Supra* ¶ 13 n.9. But we are also "institutions with authority to" govern sports— insofar as we are deciding on the kind of sporting activity that gives rise to tort liability.[24]

¶51 The majority's attempts to distinguish *Fordham* and *Nixon* are accordingly unpersuasive. Faithful application of these decisions can only lead to one conclusion.

¶52 We should apply our precedents and affirm the decision dismissing Ipsen's claims. The majority's contrary conclusion is unfaithful to our decisions in *Fordham* and *Nixon*. And the opinion in this case will effectively unravel the holding in *Fordham* in light of the thin line between negligence and gross negligence.

––––––––––––

society" in establishing the professional rescuer's exception. *See supra* ¶ 13 n.9 (quoting *Fordham*, 2007 UT 74, ¶ 8). But again, that was not the sole basis for our analysis in *Fordham*. The "broadly shared value[s]" that we cited in *Fordham* rested on principles of primary assumption of risk and implied consent. *See supra* ¶ 13 n.9. These policy considerations, in other words, were not freestanding; they were underpinned by specific legal doctrines regarding the imposition of duty. So my point about circularity stands. The majority has presented no grounds for abandoning those underlying doctrines in its decision today.

[24] The majority's only response to this problem is its assertion that "there are other mechanisms to adjudicate one's tortious behavior during a sporting event," since the rules of the game will "impose penalties on individuals and teams" where rules violations result in injury. *Supra* ¶ 13 n.9. That's fine as far as it goes. But the cited mechanisms don't impose tort duties or provide a means of compensation for victims.